Paul C. VILLANO, Appellant,

v.

UNITED STATES of America, Appellee.

No. 7060.

United States Court of Appeals Tenth Circuit.

Nov. 5, 1962.

Leslie H. Wald, Denver, Colo., for appellant.

James A. Clark, Asst. U. S. Atty. (Lawrence M. Henry, U. S. Atty., was with him on the brief), for appellee.

Before LEWIS, BREITENSTEIN and SETH, Circuit Judges.

LEWIS, Circuit Judge.

The appellant-defendant was indicted, tried by jury and convicted within the District of Colorado of failing to pay the special occupational tax imposed on his business of accepting bets on the outcome of football games, 26 U.S.C.A. §§ 4411, 4412(a), 4901 and 7262. The single appellate contention is that the trial court erred in denying appellant's motion to suppress certain evidence obtained by state officers and admittedly material to and used against appellant in the federal prosecution. The evidence was obtained without authority of search warrant, warrant of arrest or as incident to lawful arrest. The trial court's refusal to suppress such evidence was based in part upon the conclusion that appellant was not a "person aggrieved" within the meaning of Rule 41(e), Fed.Rules Crim. Proc. and in part upon a finding that appellant had freely and expressly consented to the search which resulted in the seizure of evidence. Appellant and a Denver police officer testified as to the events and circumstances leading to the search and seizure.

Before dawn of the morning of October 8, 1960, members of the Denver police department awakened appellant by pounding on the door and ringing the bell at his residence. Upon being admitted to the home, the officers ordered appellant to get dressed and to accompany them for questioning. Appellant protested but did as the police ordered. His suit coat was searched and an envelope removed.[1] Appellant testified that he protested again and tried to get back the envelope but was told that the officers could take anything they found. According to appellant he was then told to bring the keys to the place of his employment, a TV store, and when he replied that he did not have them was then told: "Well, we have to get them; we are going to break in anyway." Appellant and the officers then drove in a police car to the home of a third person where the keys were obtained and thence to the store where a search was conducted and two notebooks seized which became the subject of the motions to suppress.

Both notebooks were found in a desk used by appellant but appellant did not claim ownership to either. He asserted that several employees (including himself) used the notebooks. The entries in one book were entirely in the handwriting of appellant.

To this point in the incident there is no real conflict of the factual account of the occurrence in the testimony of the appellant and that of the police officer testifying for the government. The search of appellant's coat at his home is admitted as is the seizure at such time of an envelope. Appellant's continuing protests are admitted, the police sergeant testifying in such regard:

"Q. (By Mr. Wald) But in the course of your having Mr. Villano

---

1. The envelope was apparently not incriminating for it was later returned and was not the subject of a motion to suppress.

under arrest, didn't he ask you more than once if you could do this, if the police could do this to him, and didn't you tell him, 'Yes, we can; we can do this.'?

"A. I may have said that, yes. I don't recall, but I could have said that."

The threat of using force to gain entry to the TV store is impliedly admitted and then qualifiedly denied. On such subject the officer testified:

"Q. Do you recall telling the defendant that if he did not get the key to the State TV Store you would break in there?

"A. I don't recall those particular words. I may have said something similar."

\* \* \* \* \* \*

"Q. Did you say anything like, 'If you don't get the keys, we'll kick the door in?' A. No, sir.

"Q. Are you sure, Sergeant, that you didn't.

"A. I am pretty certain we didn't although at that time, which is prior to the Mapp decision, [Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)], we used to do that occasionally, on gambling raids and such."

We think that but a single conclusion can be drawn from the combined testimony of appellant and the police officer: that entry was made into the TV store under an aura of complete domination by police using wrongful and coercive authority amounting to duress. And it follows that the concluding actions of appellant and the police that occurred after entry to the store must be considered as a climax to the constitutionally prohibited abuse premising the entry.

Appellant categorically denied that he consented to the search of the store or any portion of it; stated that he did point out the desk which he used and did pull open two unlocked drawers of the desk while the search of the desk progressed because "he (the police officer) was going to open them anyway."

The version testified to by the police differs. The officer testified twice upon the subject. At one time he stated:

"There were at least one desk, Paul Villano came over to the desk and he says, 'Are you going to look in there? You won't find anything.' And he pulled two drawers—there were three drawers on this side of the desk—he pulled the top and lower one about half way. I pushed the two drawers back in and pulled the middle drawer out, and that's where I recovered the evidence in question here."

and at another point in his testimony:

" \* \* \* (We) got back in the police car, went down to 3214 Tejon. I asked Mr. Villano where his desk, where his area was, in the back portion to the left as you go in was a desk. He stated that was his desk and I asked if we could look through the desk and he said, 'Sure, go ahead and look around.' In fact, he pulled out two drawers."

The government also places some emphasis upon the answers given by appellant in response to an inquiry by the trial court. Appellant had been arrested and searched before and the trial court inquired of him:

"Q. Did you know that you had a right to refuse to be searched or your premises searched? A. Well, when they first came in my home they started searching, clothing on the chairs, and I tried to make a move to grab one coat and he pulled it away from me, in my home.

"Q. I didn't ask you that. I asked you if you knew you had a right to refuse to be searched? A. Well, I think I do, but it didn't do me much good.

"Q. And of course you knew that you had a right to refuse to have your desk searched, too? A. I thought so, yes, sir."

On this evidence, the court found that appellant waived his rights under the

fourth amendment to the United States Constitution and consented to the search made by the police officers; and that, as regards the notebook used by other employees, that he was not a person aggrieved.

The question of whether the appellant was the victim of an invasion of privacy to make him a party aggrieved under Rule 41(e) with standing to move for the suppression of evidence obtained through the search concerns itself primarily with the 1960 Supreme Court holding in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233. Appellant did not own the property searched—it was the property of his employer; he denied even a true possessory interest in the notebook seized; and the record does not establish that he had exclusive use of the desk wherein the incriminating material was found. Prior to the Jones decision, the courts of appeal were virtually unanimous in viewing as necessary a showing of "ownership," "right to possession," or "dominion" over the premises searched. See cases considered in Jones, pp. 265, 266, 80 S.Ct. pp. 733, 734; Wilson v. United States, 10 Cir., 218 F.2d 754. Of these cases and their reasoning the Supreme Court stated:

"We do not lightly depart from this course of decisions by the lower courts. We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * *" 362 U.S. at p. 266, 80 S.Ct. at p. 733.

and construed the rule broadly to mean:

"* * * anyone legitimately on premises where a search occurs may challenge its legality by way of motion to suppress, when its fruits are proposed to be used against him. * * *" p. 267, 80 S.Ct. p. 734.

The government appears to argue that the limitations on the Jones doctrine are not yet fully delineated and relies upon the possibility of over-precise interpretation speculated upon in Henzel v. United States, 5 Cir., 296 F.2d 650, and particularly the language at p. 653:

"This is not to say that every employee of a corporation can attack the illegal seizure of corporate property if the fruits of the search are proposed to be used against him. Each case must be decided on its own facts. * * *"

There is no necessity for either accepting or rejecting the language of the Fifth Circuit in the present case, for the controlling facts which caused that court to find that the employee had a protected interest are present here in addition to an atmosphere of invasion of privacy. The search of appellant's personal belongings at his home and in his desk where he worked clearly was "directed at" the appellant. Appellant's interest in the property seized certainly was conceived by the officers to be sufficiently personal and substantial to incline them to make the seizure in his presence without benefit of warrant.

A consideration of all the facts of this case and the type of evidence seized compels the conclusion that appellant is within the class protected under Rule 41 and that the fruits of the unlawful seizure cannot be utilized in his prosecution, Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, unless, as found by the trial court, he effectively waived his constitutional right.[2]

2. The oral findings of the court were: "My disposition is to hold that there was an intelligent and voluntary waiver shown by the evidence. To be sure there was some compulsion in his arrest, but seemingly there was a consent to the search. This is evidenced to some extent by obtaining the key, but, secondly, upon the

The question of whether consent has been given to a search which is otherwise patently unlawful is a question of fact and subject to the accepted limitations of appellate review. We have earlier indicated that such limitation lies within the "clearly erroneous" rule. Bowles v. Beatrice Creamery Co., 10 Cir., 146 F.2d 774. See also United States v. Page, 9 Cir., 302 F.2d 81. But both the initial determination of a fact which nullifies a constitutional right, and the appellate acceptance of such finding, should be approached with caution, and with full cognizance of the many limiting rules which recognize the unlikelihood of the waiver of a basic personal right. These rules have been recently summarized with comprehensive supporting citations of authority by Judge Duniway as:

> "The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given'. There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. ' "Courts indulge every reasonable presumption against waiver" of fundamental constitutional rights.' Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact. The government's burden is greater where consent is claimed to have been given while the defendant is

under arrest." United States v. Page, 9 Cir., 302 F.2d 81 at 83, 84. (Citations omitted.)

Each of these rules seems particularly applicable to the case at bar. The incident began with a violent interruption of appellant's privacy at his home at an unnatural hour and without semblance of lawful authority, continued through an unlawful search at those premises to an entry of the store made under the shadow of the badge and threat of force, and was modified only by evidence that appellant had been in trouble before, his ambiguous gesture of opening two of the desk drawers and the self-competitive testimony of the officer as to appellant's statements made at the critical moment preceding probable discovery. We think the uncontradicted evidence, considered with that most favorable to the government where conflict exists, shows a mal-conceived plan of authority carried to a prohibited conclusion. And certain it is that an unlawful search, conceived in evil, is not baptized in maturity by success of search. Gallegos v. United States, 10 Cir., 237 F.2d 694. We hold that the government did not meet its burden of showing a free and specific consent to the search and that the trial court's finding in this regard is clearly erroneous.

The judgment is reversed with directions to sustain the motions to suppress and for such further proceedings as are consistent with the decision of this court.

---

basis that he knew that he could refuse to be searched. He stated that. He was cognizant of his rights, and the undisputed evidence was that he opened the desk drawers, certainly a gesture indicating consent, and there is no credible evidence that he protested the search of the desk and to my mind the position that he

consented to the search of two drawers, and that he stopped short of the search of the middle drawer is untenable, although the Jones case may very well be applicable, as far as being an aggrieved person in this situation, as an employee of Pauldino."