**UNITED STATES of America, Plaintiff,**

v.

**Miguel SANDOVAL, Defendant.**

**No. 93–CR–69 A.**

United States District Court,
D. Utah, C.D.

July 21, 1993.

Bruce C. Lubeck, Asst. U.S. Atty., Salt Lake City, UT, for plaintiff.

D. Gilbert Athay, Loni F. DeLand, Salt Lake City, UT, for defendant.

**MEMORANDUM OPINION AND ORDER**

ALDON J. ANDERSON, Senior District Judge.

## I. Introduction

This matter is before the court on defendant Miguel Sandoval's motions to suppress evidence and statements. An evidentiary hearing was held on June 11, 1993, and arguments of counsel were heard on June 28, 1993 [1]. Between the evidentiary hearing and arguments, the court viewed Plaintiff's Exhibit 1, a video tape taken of the traffic stop and subsequent arrest of defendant, Miguel Sandoval.[2]

Sandoval argues that evidence of cocaine found in his vehicle by the Utah Highway Patrol should be suppressed because the initial traffic stop of Sandoval was merely a pretext for undertaking a search. Further, Sandoval argues that the evidence should be suppressed because he was illegally detained in violation of the Fourth Amendment to the United States Constitution. Finally, in support of the motion to suppress evidence, Sandoval argues that any consent he gave to search was not informed or voluntary, and even if informed and voluntary, that the consent was limited in scope which was exceeded by the government.

Sandoval also asks the court to suppress incriminating statements made by Sandoval, in the course of the traffic stop and arrest, because the government failed to give a Miranda warning at the time of his arrest.

Having reviewed the evidence, and considered the arguments of counsel, the court is persuaded that the cocaine and Sandoval were properly seized, and that evidence of the cocaine should not be suppressed. However, the court is also persuaded that incriminating statements made by Sandoval, subse-

---

1. The transcript of the June 11, 1993, hearing was ordered and reviewed by the court. To the extent that the transcript is relied upon, it is cited herein as TR at ___.

2. The Utah Highway Patrol vehicle which was used in stopping Sandoval was equipped with a video camera which recorded the stop. In addition, the officer involved had a microphone for the video system attached to his belt so that the conversation which took place between the offi-
cer and Sandoval was recorded. The use of such video systems is routinely used by the Utah Highway Patrol in order to create a record of traffic stops. The court found the tape to be useful in that it not only provided a contemporaneous record of what was discussed between the officer and Sandoval, but it also allowed the court to hear the voices of the parties and to determine what tone of voice was being used by the officer.

quent to his arrest and prior to his receiving a Miranda warning, must be suppressed.

## II. Facts

On March 22, 1993, Utah Highway Patrolman Jim Hillin stopped a pickup being driven by Miguel Sandoval. The evidence is clear that the stop was made for speeding (71–73 mph in a 65 mph zone), and that Hillin was acting as he would normally have done in carrying out his responsibilities.[3]

After Sandoval's vehicle came to a stop, Officer Hillin left the Highway Patrol vehicle and spoke with Sandoval through the open window of the pickup.[4] Hillin asked for Sandoval's license and the vehicle registration. The registration showed that the pickup was registered to a Sandy Sandoval, who Sandoval claimed to be his daughter.[5] Hillin then asked Sandoval where he was heading, and Sandoval responded that he was going to Denver to visit a friend.

Following the foregoing exchange, Hillin returned to his vehicle to write a warning citation for speeding. While in the vehicle, he called the dispatcher to ask for computer checks on both Sandoval and vehicle. This was standard operating procedure for Hillin.[6]

The dispatcher responded that the pickup was registered to Sandy Sandoval, and had not been reported as stolen. The dispatcher further informed Hillin that Sandoval had a criminal record which included a previous arrest for narcotic violations.[7]

Hillin then left his vehicle and asked Sandoval to accompany him back to the Utah Highway Patrol vehicle, where Hillin showed Sandoval the radar gun reading of 71 mph[8]. Hillin asked Sandoval to slow down in the future, and Sandoval responded "OK." Hillin then handed Sandoval a warning citation, the receipt of which is indicated on the video tape by another Sandoval "OK." Finally, Hillin returned Sandoval's license and registration, and Sandoval, again, on the video tape says "OK."

Following the handing back of the license and registration to Sandoval, Officer Hillin is heard on the video tape to say "no, wait a minute."[9] Officer Hillin then informed Sandoval that dispatch had informed him that Sandoval had been arrested before, and Officer Hillin asked Sandoval if he could recall what the arrest was for. Sandoval was evasive in his answer, and said that he could not

**3.** TR at 7–8.

**4.** TR at 15–16. While Sandoval testified in court that he did not have a good command of the English language, and had need of the interpreter which was provided by the court, the video tape of the stop and conversation between Officer Hillin and Sandoval rebuts that position. The tape clearly shows that Sandoval, a longtime resident of the United States, has a good command of the English language, and was aware of the content and meaning of the conversation he had with Officer Hillin.

**5.** TR at 13–14.

**6.** TR at 15.

**7.** TR at 15–16. The recording of the conversation between Officer Hillin and the dispatcher did not record Hillin's inquiries due to a failure of the officer to switch over from his belt microphone to the Highway Patrol vehicle microphone, while in the vehicle. The dispatcher's voice is clear, however, and substance of the exchange was credibly testified to by Officer Hillin at the June 11, 1993 hearing. This recording oversight was corrected by Officer Hillin for subsequent conversations in the Highway Patrol vehicle between himself and Sandoval. TR at 50–51.

**8.** TR at 16–17. Officer Hillin testified that the reason for inviting Sandoval back to the patrol vehicle was so that he could inquire about Sandoval's criminal history. *Id.* Sandoval agreed to the request. *Id.* Officer Hillin did not order Sandoval to go to the patrol vehicle, and the court believes, based upon the tone of voice used by the officer, that a reasonable person would have felt free to turn down the request.

**9.** Unfortunately, the video tape does not show the individuals in the Utah Highway Patrol vehicle. Consequently, the court has to rely upon the recorded conversation and background noise to determine what is happening. It is unclear from the tape whether or not Officer Hillin's statement "no, wait a minute" is in response to a movement by Sandoval to exit the vehicle. From evidence presented at the June 11, 1993, hearing, however, the court does not believe the statement was made to stop Sandoval from leaving the vehicle, but was rather an indication by the officer that he wanted to continue his conversation with Sandoval. As noted in this opinion, the court believes Sandoval did not have to stay to continue the conversation, but was free to go when he received back the drivers license and registration. TR at 42.

remember. Hillin then reminded Sandoval about the previous drug offense and asked if he was still into drugs. Sandoval responded no. Hillin then asked if Sandoval would be willing to have Hillin examine the pickup truck for drugs and weapons. Sandoval responded "sure."

While searching the vehicle, Hillin asked Sandoval about his trip to Denver. Sandoval responded that he was going to visit a friend by the name of Pablo. Sandoval did not know Pablo's address, however, and from the tone and substance of the exchange, Officer Hillin could have formed a reasonable suspicion that the proposed trip to Denver was not as represented by Sandoval.

Hillin's search of the pickup included a visual inspection of the truck's undercarriage. Sandoval observed the scope of the search, but made no apparent effort to stop it. Indeed, after Officer Hillin found spot welding and hinges to an access door on the driver side fuel tank [10], and asked Sandoval if he could take a closer look, Sandoval responded in the affirmative. [11]

After closer inspection of the pickup's modification and the access door, Officer Hillin, and another peace officer who came to the scene after discovery of the modifications, opened the hidden access door and discovered packages which contained cocaine. Sandoval was then placed under arrest and asked about the cocaine.

No Miranda warning was given by Officer Hillin at the time of Sandoval's arrest. Instead, Officer Hillin asked Sandoval about the drugs, and whether or not Sandoval would be willing to work with the police to arrest the parties to whom the cocaine was to be delivered. Sandoval expressed some willingness to help. Sandoval was then transported to the nearest police station and given the Miranda warning. After receiving the

warning, Sandoval decided not to cooperate with the police.

### III. Discussion

#### A. *Motion to Suppress Evidence.*

1. The Initial Stop of Sandoval Was Not Pretextual.

In support of Sandoval's motion to suppress evidence, Sandoval argues that Officer Hillin's initial stop of the pickup was merely a pretext to search the vehicle. The search was therefore illegal, and Sandoval asks the court to suppress the cocaine seized as a result of that search. [12] The Tenth Circuit Court of Appeals has stated:

> A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example, presented in this case, occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity.

*United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988).

To establish a non-pretextual stop, it must be shown, using an objective standard, that a reasonable officer would have made the stop in the usual practice without regard to an invalid purpose. *Id.* at 1517.

Applying this standard to Sandoval's argument, it is clear to the court that the initial stop of the vehicle was not pretextual. The truck was traveling 71 to 73 mph in a 65 mph zone. The video tape and testimony offered by Officer Hillin establishes that he would have pulled over any vehicle under similar circumstances to issue a warning citation or a ticket. Further, the court believes that any reasonable officer would have acted

---

**10.** The pickup was equipped with two fuel tanks. The driver side tank appeared to be new, while the passenger side tank was older.

**11.** Based on the officer's past experience in drug interdiction activities, the condition of the driver side fuel tank indicated a high degree of probability that drugs were being transported by Sandoval. Rather than rely upon that probability to

search further, Officer Hillin obtained Sandoval's voluntary consent.

**12.** At the beginning of oral argument, counsel for Sandoval acknowledged that the facts might not support his client's "pretext" argument. He refused, however, to waive the issue, and toward the end of oral argument stated that he may have been too hasty in agreeing with the government.

the same way. Accordingly, no pretext stop has been shown, and the cocaine seized will not be suppressed under that standard.

### 2. The Temporary Detention and Questioning of Sandoval Was Proper.

■■■ The Tenth Circuit has held that where a law enforcement officer has legitimately stopped a vehicle for a traffic violation, the officer may not use the opportunity to ask intrusive questioning beyond that reasonably necessary under the circumstances. *United States v. Guzman,* 864 F.2d at 1518–19. The officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *Id.* at 1519. The officer may also inquire as to the identity of the vehicle's passengers and travel plans. *See United States v. Rivera,* 867 F.2d 1261, 1263 (10th Cir.1989).

■■■ In this case, Officer Hillin complied with the foregoing standard. Officer Hillin only held Sandoval's driver's license and the vehicle registration for as long as was necessary to obtain a computer check on Sandoval and the pickup. Officer Hillin was entitled to ask about Sandoval's travel plans, and did not use the initial stop to ask intrusive questions. Indeed, a review of the video tape shows that Officer Hillin was, at all times, courteous and polite and did not exceed his authority. Even the officer's initial invitation to Sandoval to join him in the Highway Patrol vehicle was made as a request, and not given as an order.

■■■ A closer issue exists, however, as to Officer Hillin's questions about Sandoval's criminal record and Sandoval's present involvement with drugs. The Tenth Circuit stated in *United States v. Guzman,* 864 F.2d 1512, 1519 (1988), that once a valid license has been produced by the operator of a vehicle and it becomes clear that the operator is entitled to drive the vehicle, the operator "must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."

■■■ The only exceptions to the foregoing rule are where the law enforcement officer

has a reasonable suspicion of criminal activity, or the questions and answers are part of "an ordinary consensual encounter between a private citizen and a law enforcement official." *United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990), distinguishing *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988). Such a "consensual encounter" cannot take place, however, until the law enforcement officer returns the drivers license and registration to the vehicle operator, and there exists no objective reason for the operator "to believe that he [is] not free to end his conversation with the law enforcement official and proceed on his way." *United States v. Turner,* 928 F.2d 956 (10th Cir. 1991).

The evidence is clear that Officer Hillin returned Sandoval's drivers license and pickup registration prior to questioning him about his criminal history and present involvement with drugs. Because of that fact, the government argues that the questions were part of a legitimate "consensual citizen/police encounter." Alternatively, the government argues that Sandoval's criminal history was sufficient to raise enough "reasonable suspicion" to justify asking Sandoval about the criminal history. When Sandoval gave an evasive response to the question about the criminal history, the government argues, the response allowed additional questioning to take place.

■■■ Turning to the government's second argument first, this court does not believe that peace officer's knowledge of an individual's past criminal history, absent other factors, is enough to give rise to a "reasonable suspicion" of present wrongdoing. *See United States v. Daniel,* 804 F.Supp. 1330, 1335 n. 10 (D.Nev.1992) (status of a gang member, standing alone, does not make out reasonable suspicion); *Robinson v. State,* 388 So.2d 286, 290 (Fla.App.1980) ("knowledge of a suspect's previous arrest, standing alone, is insufficient to give rise to a reasonable suspicion"). The fact that Officer Hillin knew of Sandoval's criminal history, therefore, was not a legitimate basis for asking questions about that history.[13]

---

**13.** Based on the foregoing, Sandoval could argue

that it was inappropriate for Officer Hillin to ask

On the other hand, Officer Hillin was free to ask about Sandoval's criminal history as long as it was part of a "consensual citizen/police encounter." The Tenth Circuit states in *United States v. Turner*, 928 F.2d 956, 959 (1991) that once an officer has "returned defendant's license and registration, [the court] must consider 'whether a reasonable person under the circumstances would believe she was not free to leave and/or disregard the official's request for information.'" Quoting *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990). Factors to be considered are whether or not there is more than one officer present, whether a weapon is displayed, or the officer is physically touching the citizen, or whether the officer is using "a commanding tone of voice indicating that compliance might be compelled." *United States v. Turner*, 928 F.2d at 959 (10th Cir.1991).

Applying the *Turner* standard to the facts, the court finds that the objective evidence indicates that a reasonable person would have believed, in Sandoval's position, that he was free to leave after receiving back the drivers license and registration.[14] Officer Hillin was the only officer present at the time of the initial questioning, did not display a gun, and did not physically touch Sandoval in such a manner as to compel compliance. Further, as previously noted, the tone of voice used by Officer Hillin was not commanding, but was polite and respectful.

Having determined that Sandoval was free to go after receiving back his license and registration, the court concludes that the questions presented to Sandoval by Officer Hillin as to Sandoval's prior criminal record and present involvement with drugs were part of a "consensual encounter between a private citizen and a law enforcement officer." *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990). The questions, therefore, do not provide a basis for suppression of evidence.

3. The Search and Seizure of the Cocaine Was Proper.

After asking Sandoval about his prior involvement with drugs, Officer Hillin asked Sandoval if he was willing to have Hillin examine the pickup truck for drugs and weapons. Sandoval responded "sure." As noted by the United States District Court in Kansas:

A search and seizure may be made even without probable cause if voluntary consent is given. *United States v. Rivera*, 867 F.2d 1261, 1265 (10th Cir.1989). The proper test in consent search cases is not whether there was a waiver of the defendant's fourth amendment rights, but whether the consent to search was voluntary under the totality of the circumstances. *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir.1991). There is no presumption against waiver of fourth amendment rights. *See id.* at 1270–71. Whether a consent to search is voluntary or was a product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances and is a matter which the government has the burden of proving. (Citations omitted.) The government must show that here was no duress or coercion, express or implied. Consent must be unequivocal and specific and freely and intel-

---

Sandoval to come back to the patrol vehicle to discuss the speeding ticket. See footnote 8 *supra*. Exhibit 1 demonstrates, however, that the criminal history was not the sole basis for the officer's invitation. For example, upon getting into the patrol vehicle, Officer Hillin showed Sandoval the recorded speed shown on the patrol vehicle's radar display to illustrate the validity of the warning ticket. To the extent the officer had a valid reason to invite Sandoval back to the patrol vehicle, the invitation did not violate Sandoval's rights. Further, as noted in footnote 8 *supra*, this court believes Sandoval did not have to accept the officer's invitation.

14. Sandoval argues that as an individual of Mexican background, he did not feel free to leave the Highway Patrol vehicle after receiving back his license and registration. Culturally, Sandoval argues, he was incapable of disobeying the police, and felt compelled to answer all questions put to him. While the court questions the factual basis of Sandoval's argument, it believes that the argument ignores the "objective" nature of the *Turner* standard. The question is not whether or not Sandoval subjectively believed he was free to go, but whether or not a reasonable person would believe, under the circumstances, that he was free to go.

ligently given. *United States v. Price*, 925 F.2d at 1270.

*United States v. $83,900.00 in U.S. Currency*, 774 F.Supp. 1305, 1315 (D.Kan.1991).

After reviewing all of the evidence, and after observing the demeanor of the witnesses, the court is persuaded that Sandoval freely and voluntarily consented to the search of the pickup for drugs. The use of the word "sure" by Sandoval, in response to Officer Hillin's request to search, was unequivocal and was not limited in scope.[15] Indeed, when Officer Hillin found an access door to a hidden compartment, in his search of the pickup, the officer reaffirmed Sandoval's consent to search by asking if he could take a closer look. Again, permission was given by Sandoval.

In light of Sandoval's voluntary consent to search, and the complete lack of coerciveness on the part of Officer Hillin, the court finds that the cocaine was properly seized, and need not be suppressed.

**B. Motion to Suppress Statements**

█ As noted above, until the cocaine was found, Sandoval was free to go.[16] Up to the time the cocaine was found in the hidden compartment, and Sandoval was handcuffed by Officer Hillin, Sandoval was not in "custody." Consequently, statements made by Sandoval to Officer Hillin are admissible without need of a Miranda warning. *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *United States v. Pena*, 920 F.2d 1509 (10th Cir.1990).

█ However, as conceded by the government, once Sandoval was placed under arrest, he was entitled to receive the Miranda Warning. Consequently, incriminating statements made by Sandoval after his arrest, and before his receiving of the Miranda Warning must be suppressed. This is true,

even though this court believes from reviewing Exhibit 1, that the statements were voluntarily made, and were not product of coercion. See *Withrow v. Williams*, —— U.S. ——, ——, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993) (retaining *Miranda's* bright line test as to admissibility of statements made upon arrest). Once Sandoval received the Miranda Warning, however, statements made by him need not be suppressed.

**V. Conclusion**

Sandoval freely and voluntarily consented to the search of his vehicle which gave rise to the seizure of the cocaine in question. No objective evidence exists to indicate that Sandoval was not free to go after receiving back from Officer Hillin his license and registration. The questions presented by the officer, as to Sandoval's past criminal history, drugs and weapons, were not illegal. The Motion to Suppress Evidence is denied.

Up to his arrest, upon the finding of the cocaine, no custodial interrogation took place. Statements made by Sandoval to that point are admissible. Also, statements made by Sandoval after receiving the Miranda Warning are admissible. Statements made by Sandoval after the arrest, but before the Miranda Warning, are inadmissible, and are suppressed.

---

**15.** Sandoval argues that he only intended to authorize Officer Hillin to look in the cab of the pickup. No such intent was communicated to Officer Hillin, however. Indeed, given the nature of the officer's inquiry, "Are you transporting drugs?", Sandoval must have known that a search would not be confined to the cab, but would extend to those areas of the vehicle where drugs might be hidden.

**16.** For purposes of this opinion, the court need not determine whether or not Officer Hillin had probable cause to arrest Sandoval prior to the time at which he did so. However, the fact that the officer may have been able to arrest Sandoval earlier in time, such as when the access door was first found, and probable cause arose, does not mean that Sandoval was in "custody" earlier in time.